**Daniel Berke** (db1855)
Berke & Associates PLLC
203 East 72nd Street, Suite 6A
New York, NY 10021
Tel: (917) 747-4263
Email: danberke100@gmail.com
*Attorney for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **BILLY FIELDS**, | **COMPLAINT** |
| Plaintiff, | |
| -against- | |
| **MAX DEALS BOSTON INC., WHITE POST ASSOCIATES, LLC**, | **CASE NO.: 25-cv-7310** |
| Defendants. | **JURY DEMANDED** |

## CIVIL COMPLAINT

BILLY FIELDS (the "Plaintiff"), as and for his complaint against MAX DEALS BOSTON INC. and WHITE POST ASSOCIATES, LLC (the "Defendants"), respectfully brings before the Court the below allegations.

## STATEMENT OF PLAINTIFF'S CLAIMS

1. This is an action under Title III of the Americans with Disabilities Act of 1990 (the "ADA") to enjoin unlawful discrimination based on disability. Plaintiff was discriminated against on the basis of disability and was denied full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the place of public accommodation owned, leased, leased to, controlled, managed, or operated, by Defendants.

2. Plaintiff files this action complaining of the violations of Title III of the ADA. This action is brought under ADA 42 U.S.C. §12182, §12183, and §12188(a) – incorporating by reference the remedies and procedures found in 42 U.S.C. §2000a-3, §204 of the Civil Rights Act of 1964 – the ADA's Accessibility Guidelines, 28 C.F.R. Part 36, subpart D, the 2004 ADA Accessibility Guidelines ("ADAAG") at 36 C.F.R. Part 1191, appendices B and D, the 2010 ADA Standards for Accessible Design ("2010 Standards"), the Building Code of the State of New York, as well as New York State Civil Rights Law §40-c and §40-d, New York State Human Rights Law §296, and New York City Human Rights Law [Administrative Code] §8-107.

3. Plaintiff seeks compensatory and statutory damages, declaratory and injunctive reliefs, attorney's fees, expert fees, and costs against Defendants, as well as such other relief as the Court deems to be just and proper.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. §451, §1331, §1337, §1343, §2201, §2202, and 42 U.S.C.A. §12181, *et seq.*, as it involves federal questions regarding the deprivation of Plaintiff's rights under the ADA.

5. This Court has supplemental jurisdiction over Plaintiff's allegations arising from Defendants' state law violations pursuant to 28 U.S.C. §1367(a).

6. Venue is proper in this district pursuant to 28 U.S.C. §1391(b), because all events, or omissions, giving rise to this action, and alleged herein, occurred in this district.

7. Venue is also proper in this district because Defendants' property, the public accommodation, which is the subject of this action, is both located in, and does business within, this judicial district.

## PARTIES

8. At all times material to this litigation, Plaintiff is and has been, a resident of New York County, New York.

9. Plaintiff is a qualified individual with a disability within the meaning of 42 U.S.C. §12131, who is expressly authorized to bring this action under §308 of the ADA, 42 U.S.C. §12188(a) – incorporating by reference the remedies and procedures found in 42 U.S.C. §2000a-3, §204 of the Civil Rights Act of 1964.

10. All references to Max Deals in this complaint are made regarding the store Max Deals, and the building in which it is located, 2441 Boston Rd., Bronx, NY 10467 ("Max Deals").

11. Plaintiff's complaint stems from the discrimination he has experienced in the parking lot of the store Max Deals, where he had difficulties maneuvering his motorized mobility scooter on the steep access aisle and accessible space.

12. All references to the parking lot in this complaint are made regarding the parking lot adjacent to Max Deals, located at 2441 Boston Rd., Bronx, NY 10467 (the "Parking Lot").

13. The Office of the City Register of the New York City Department of Finance maintains a deed record showing that WHITE POST ASSOCIATES, LLC is the owner of the real property identified on the NYC Tax Map of the Bronx County as Block 4430, Lots 37, 41, and 42, located at 2441 Boston Rd., Bronx, NY 10467 (the "Commercial Lots").

14. At all relevant times herein, Max Deals and the Parking Lot have been and are located on the Commercial Lots.

15. At all relevant times herein, Defendant MAX DEALS BOSTON INC. leases the building in which Max Deals is located, from the owner of that building, Defendant WHITE POST ASSOCIATES, LLC.

16. At all relevant times herein, Defendant MAX DEALS BOSTON INC. controls Max Deals.

17. At all relevant times herein, Defendant MAX DEALS BOSTON INC. manages Max Deals.

18. At all relevant times herein, Defendant MAX DEALS BOSTON INC. maintains Max Deals.

19. At all relevant times herein, Defendant MAX DEALS BOSTON INC. designed Max Deals.

20. At all relevant times herein, Defendant MAX DEALS BOSTON INC. built Max Deals.

21. At all relevant times herein, Defendant MAX DEALS BOSTON INC. constructed Max Deals.

22. At all relevant times herein, Defendant MAX DEALS BOSTON INC. erected Max Deals.

23. At all relevant times herein, Defendant MAX DEALS BOSTON INC. altered Max Deals.

24. At all relevant times herein, Defendant MAX DEALS BOSTON INC. operates Max Deals.

25. At all relevant times herein, Defendant MAX DEALS BOSTON INC. operated Max Deals.

26. At all relevant times herein, Defendant MAX DEALS BOSTON INC. has control over the Parking Lot.

27. At all relevant times herein, Defendant MAX DEALS BOSTON INC. manages the Parking Lot.

28. At all relevant times herein, Defendant MAX DEALS BOSTON INC. maintains the Parking Lot.

29. At all relevant times herein, Defendant MAX DEALS BOSTON INC. designed the Parking Lot.

30. At all relevant times herein, Defendant MAX DEALS BOSTON INC. built the Parking Lot.

31. At all relevant times herein, Defendant MAX DEALS BOSTON INC. constructed the Parking Lot.

32. At all relevant times herein, Defendant MAX DEALS BOSTON INC. erected the Parking Lot.

33. At all relevant times herein, Defendant MAX DEALS BOSTON INC. altered the Parking Lot.

34. At all relevant times herein, Defendant MAX DEALS BOSTON INC. operates the Parking Lot.

35. At all relevant times herein, Defendant MAX DEALS BOSTON INC. operated the Parking Lot.

36. At all relevant times herein, Defendant WHITE POST ASSOCIATES, LLC owns the Commercial Lots.

37. At all relevant times herein, Defendant WHITE POST ASSOCIATES, LLC has control over the Parking Lot.

38. At all relevant times herein, Defendant WHITE POST ASSOCIATES, LLC manages the Parking Lot.

39. At all relevant times herein, Defendant WHITE POST ASSOCIATES, LLC maintains the Parking Lot.

40. At all relevant times herein, Defendant WHITE POST ASSOCIATES, LLC designed the Parking Lot.

41. At all relevant times herein, Defendant WHITE POST ASSOCIATES, LLC built the Parking Lot.

42. At all relevant times herein, Defendant WHITE POST ASSOCIATES, LLC constructed the Parking Lot.

43. At all relevant times herein, Defendant WHITE POST ASSOCIATES, LLC altered the Parking Lot.

44. At all relevant times herein, Defendant WHITE POST ASSOCIATES, LLC operates the Parking Lot.

45. At all relevant times herein, Defendant WHITE POST ASSOCIATES, LLC operated the Parking Lot.

46. At all relevant times herein, Max Deals is in a building erected on the Commercial Lots.

47. At all relevant times herein, Max Deals is in a building constructed on the Commercial Lots.

48. At all relevant times herein, Max Deals is in a building built on the Commercial Lots.

49. At all relevant times herein, the Parking Lot is used by customers of Max Deals.

50. At all relevant times herein, customers of Max Deals park their vehicles in the Parking Lot.

51. At all relevant times herein, MAX DEALS BOSTON INC. operates the store Max Deals in the building owned by Defendant WHITE POST ASSOCIATES, LLC.

52. At all relevant times herein, Defendant WHITE POST ASSOCIATES, LLC is a lessor and leases part of its Commercial Lots to Defendant MAX DEALS BOSTON INC.

53. At all relevant times herein, Defendant MAX DEALS BOSTON INC. is a lessee and leases part of the Commercial Lots from Defendant WHITE POST ASSOCIATES, LLC.

54. Max Deals and the Parking Lot are the subject of this lawsuit and are hereinafter referred to both by their names and collectively as the "Subject Facility."

55. MAX DEALS BOSTON INC. is an American for-profit corporation organized under the laws of New York State.

56. MAX DEALS BOSTON INC. is licensed to conduct business in the State of New York by the New York State Department of State ("NYS DOS").

57. NYS DOS maintains entity information for MAX DEALS BOSTON INC. in its Corporation and Business Entity Database ("CBED").

58. NYS DOS CBED maintains a corporate record for MAX DEALS BOSTON INC.

59. NYS DOS CBED's corporate record for MAX DEALS BOSTON INC. does not contain information regarding its chief executive officer's name and address.

60. NYS DOS CBED's corporate record for MAX DEALS BOSTON INC. does not contain the address of its principal executive office.

61. NYS DOS CBED's corporate record for MAX DEALS BOSTON INC. contains no information regarding its registered agent.

62. MAX DEALS BOSTON INC. does not have a registered agent.

63. The name and address of MAX DEALS BOSTON INC.'s registered agent are not known to Plaintiff.

64. NYS DOS CBED's corporate record for MAX DEALS BOSTON INC. contains no information regarding the name and address of its primary location.

65. NYS DOS CBED record for MAX DEALS BOSTON INC. states that "the Post Office address to which the Secretary of State shall mail a copy of any process against the corporation served upon the Secretary of State by personal delivery," when served on the

Secretary of State as agent, is Max Deals Boston Inc., 2441 Boston Road, Bronx, NY 10467.

66. The Office of the City Register of the New York City Department of Finance maintains a deed record showing that the Commercial Lots, on which Max Deals and the adjacent Parking Lot are located, are owned by WHITE POST ASSOCIATES, LLC.

67. At all relevant times herein, WHITE POST ASSOCIATES, LLC was, and currently is, the owner of the Commercial Lots in the Bronx County on which the Subject Facility is located.

68. WHITE POST ASSOCIATES, LLC is an American for-profit limited liability company organized under the laws of New York State.

69. WHITE POST ASSOCIATES, LLC is licensed to conduct business in the State of New York by the NYS DOS.

70. NYS DOS maintains entity information for WHITE POST ASSOCIATES, LLC in its CBED.

71. NYS DOS CBED maintains a company record for WHITE POST ASSOCIATES, LLC.

72. The company record for WHITE POST ASSOCIATES, LLC does not state its chief executive officer's name and address.

73. The corporate record for WHITE POST ASSOCIATES, LLC does not state the address of its principal executive office.

74. The corporate record for WHITE POST ASSOCIATES, LLC does not state its registered agent's name and address.

75. WHITE POST ASSOCIATES, LLC does not have a registered agent.

76. The name and address of WHITE POST ASSOCIATES, LLC's registered agent are not known to Plaintiff.

77. The corporate record for WHITE POST ASSOCIATES, LLC does not state the name and address of the entity's primary location.

78. The corporate record for WHITE POST ASSOCIATES, LLC states that the post office address, to which the Secretary of State shall mail a copy of any process against the entity served upon the Secretary of State by personal delivery is the following: Mark Management Associates, LLC, 720 Tuckahoe Road, Yonkers, NY 10710.

79. The Office of the City Register of the New York City Department of Finance maintains a deed record showing that WHITE POST ASSOCIATES, LLC is located at 720 Tuckahoe Road, Yonkers, NY 10710.

80. At all relevant times herein, and upon information and belief, pursuant to a real property lease between Defendants, MAX DEALS BOSTON INC. is responsible for ensuring that the Parking Lot complies with the 1991 ADA Standards.

81. At all relevant times herein, and upon information and belief, pursuant to the lease between Defendants, MAX DEALS BOSTON INC. is responsible for ensuring that the Parking Lot complies with the 2010 ADA Standards.

82. At all relevant times herein, and upon information and belief, pursuant to the lease between Defendants, MAX DEALS BOSTON INC. is responsible for ensuring that the Parking Lot complies with 28 C.F.R. §36.201.

83. At all relevant times herein, and upon information and belief, pursuant to the lease between Defendants, MAX DEALS BOSTON INC. is responsible for ensuring compliance of the Parking Lot with the New York State Civil Rights laws.

84. At all relevant times herein, and upon information and belief, pursuant to the lease between Defendants, MAX DEALS BOSTON INC. is responsible for ensuring compliance of the Parking Lot with the New York State Human Rights laws.

85. At all relevant times herein, and upon information and belief, pursuant to the lease between Defendants, MAX DEALS BOSTON INC. is responsible for ensuring compliance of the Parking Lot with the New York City Human Rights laws.

86. Any contractual provisions stating otherwise notwithstanding, WHITE POST ASSOCIATES, LLC, the landlord and owner of the property, which houses the public accommodation, cannot escape liability for the tenant MAX DEALS BOSTON INC.'s failure to comply with the ADA.

87. Any contractual provisions stating otherwise notwithstanding, WHITE POST ASSOCIATES, LLC, the landlord and owner of the property, which houses the public accommodation, cannot escape liability for the tenant MAX DEALS BOSTON INC.'s failure to comply with the New York State Civil Rights laws.

88. Any contractual provisions stating otherwise notwithstanding, WHITE POST ASSOCIATES, LLC, the landlord and owner of the property, which houses the public accommodation, cannot escape liability for the tenant MAX DEALS BOSTON INC.'s failure to comply with the New York State Human Rights laws.

89. Any contractual provisions stating otherwise notwithstanding, WHITE POST ASSOCIATES, LLC, the landlord and owner of the property, which houses the public accommodation, cannot escape liability for the tenant MAX DEALS BOSTON INC.'s failure to comply with the New York City Human Rights laws.

90. At all relevant times herein, Defendants are jointly and severally liable for the design of the Parking Lot.

91. At all relevant times herein, Defendants are jointly and severally liable for the construction of the Parking Lot.

92. At all relevant times herein, Defendants are jointly and severally liable for the maintenance of the Parking Lot.

93. At all relevant times herein, Defendants are jointly and severally liable for the management of the Parking Lot.

94. At all relevant times herein, Defendants are jointly and severally liable for the control of the Parking Lot.

95. At all relevant times herein, Defendants are jointly and severally liable for the alteration of the Parking Lot.

96. At all relevant times herein, Defendants are jointly and severally liable for the operation of the Parking Lot.

97. After January 26, 1992, either one of Defendants, or both of them, jointly or severally, simultaneously, or at different times, and at all relevant times herein, managed, and/or had control over, and/or operated, and/or designed, and/or constructed, and/or built, and/or erected, and/or painted, and/or marked, and/or placed signs on, and/or maintained, and/or made alterations to the Parking Lot.

98. After March 15, 2012, either one of Defendants, or both of them, jointly or severally, simultaneously, or at different times, and at all relevant times herein, managed, and/or had control over, and/or operated, and/or designed, and/or constructed, and/or built, and/or

erected, and/or painted, and/or marked, and/or placed signs on, and/or maintained, and/or made alterations to the Parking Lot.

99. Max Deals is a store and is thus a public accommodation within the meaning of Title III of the ADA, 42 U.S.C. §12181(7)(E) and 28 C.F.R. §36.104 Place of public accommodation (5), the New York State Human Rights Law §292(9) and the New York City Human Rights Law, Admin. Code of the City of New York, §8-107(4).

## STATUTORY SCHEME

100.    On July 26, 1990, Republican President George H. W. Bush, who himself subsequently became disabled and had to rely on a wheelchair later in his life, signed the ADA into law, which extended essential civil rights to individuals with disabilities.

101.    That law was championed by Senator Robert J. Dole, who suffered from a significant disability, which resulted from the wounds he received while fighting in Italy during liberation of the world from the fascists' dictatorship during World War II.

102.    On that day, July 26, 1990, the United States of America enacted the ADA, establishing extremely important and incontrovertibly indispensable civil rights for individuals with disabilities, including the right to full and equal enjoyment of goods, services, facilities, privileges, and access to places of public accommodation.

103.    Congress made the following findings:

      a.    Some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older;

      b.    Historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

      c.    Discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodation, education, transportation, communication, recreation, institutionalization, health services, voting and access to public services;

      d.    Individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and regulation to lesser services, programs, activities, benefits, jobs or other opportunities; and

e.  The continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. §12101(a)(1)-(3), (5) and (8)

104.    Furthermore, Congress also explicitly stated that the ADA had to:

a.  Provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

b.  Provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c.  Invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

42 U.S.C. §12101(b)(1)(2) and (4)

105.    Furthermore, pursuant to 42 U.S.C. §12182 and 28 C.F.R. §36.201(a), the congressional intent was to ensure that no place of public accommodation may discriminate against an individual on the basis of such individual's disability, with regard to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations at that place of public accommodation.

106.    Congress provided commercial businesses at least 18 months from enactment to make their facilities compliant with the regulations in the ADA. The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if a defendant has ten (10), or fewer, employees and gross receipts of $500,000, or less. 42 U.S.C. §12183; 28 C.F.R. §36.508(a).

107.    The 2000 United States census indicates that in the civilian non-institutionalized population more than 49.7 million people in the United States have a disability. The census also indicates that more than 1.39 million New Yorkers have a mobility disability.

108.    ADA 42 U.S.C. §12182(a), the New York State Civil Rights laws, the New York State Human Rights laws, and the New York City Human Rights laws recognize individuals with disabilities as a protected class.

109.    It is unlawful for a private entity which owns, leases, leases to, or operates a place of public accommodation, to discriminate against an individual with a disability. 42 U.S.C. §12182(b)(1)(A), 28 C.F.R. §36.201(a) and (b).

110.    Pursuant to the mandates of 42 U.S.C. §12134(a), on July 26, 1991, the Department of Justice, Office of the Attorney General, promulgated Federal Regulations to implement the requirements of the ADA, known as the ADAAG, 28 C.F.R. §36, under which it may

obtain civil penalties of up to $110,000 for the first violation and $150,000 for any subsequent violation.

111.    The landlord, Defendant WHITE POST ASSOCIATES, LLC, who owns the building that houses a place of public accommodation and the tenant, who owns, or operates the place of public accommodation, have a non-delegable duty to comply with the ADA.

112.    The landlord, Defendant WHITE POST ASSOCIATES, LLC, which owns the building that houses a place of public accommodation and the tenant, which owns, or operates the place of public accommodation, have a non-delegable duty to comply with the New York State Civil Rights laws.

113.    The landlord, Defendant WHITE POST ASSOCIATES, LLC, which owns the building that houses a place of public accommodation and the tenant, which owns, or operates the place of public accommodation, have a non-delegable duty to comply with the New York State Human Rights laws.

114.    The landlord, Defendant WHITE POST ASSOCIATES, LLC, which owns the building that houses a place of public accommodation and the tenant, which owns, or operates the place of public accommodation, have a non-delegable duty to comply with the New York City Human Rights laws.

115.    The Subject Facility affects interstate commerce within the meaning of the ADA, 42 U.S.C. §12181(7)(E).

116.     The Subject Facility affects interstate commerce within the meaning of 28 C.F.R. §36.104 Place of public accommodation (5).

117.    Regardless of any contractual provisions stating otherwise, Defendant WHITE POST ASSOCIATES, LLC, the landlord and owner of the property, which houses the public accommodation, cannot escape liability for the tenant's failure to comply with the ADA.

118.    Regardless of any contractual provisions stating otherwise, Defendant WHITE POST ASSOCIATES, LLC, the landlord and owner of the property, which houses the public accommodation, cannot escape liability for the tenant's failure to comply with the New York State Civil Rights laws.

119.    Regardless of any contractual provisions stating otherwise, Defendant WHITE POST ASSOCIATES, LLC, the landlord and owner of the property, which houses the public accommodation, cannot escape liability for the tenant's failure to comply with the New York State Human Rights laws.

120.    Regardless of any contractual provisions stating otherwise, Defendant WHITE POST ASSOCIATES, LLC, the landlord and owner of the property, which houses the public accommodation, cannot escape liability for the tenant's failure to comply with the New York City Human Rights laws.

121.    Discriminatory intent is not required to establish liability under the ADA.

122.    Discriminatory intent is not required to establish liability under the New York State Civil Rights Laws.

123.    Discriminatory intent is not required to establish liability under the New York State Human Rights laws.

124.    Discriminatory intent is not required to establish liability under the New York City Human Rights laws.

125.     One type of disability discrimination is the failure of an owner, or an operator, of a public accommodation, to remove those architectural barriers, removal of which is readily achievable.

> A public accommodation shall remove architectural barriers in existing facilities, including communication barriers that are structural in nature, where such removal is readily achievable, i.e., easily accomplishable and able to be carried out without much difficulty or expense.

> 28 C.F.R. §36.304

126.     Defendants must remove all barriers, removal of which is readily achievable, that deny an individual with a disability the opportunity to participate in, or benefit from, services, or accommodations, on the basis of their disability, 28 C.F.R. §36.304.

127.     At all relevant times herein, removal of the architectural barriers at the Subject Facility by either one of Defendants has been and is readily achievable.

128.     At all relevant times herein, one or both Defendants failed to remove architectural barriers to entry for disabled individuals that have been present at the Subject Facility even though it has been readily achievable to remove them.

129.     "'[D]iscrimination' includes, with respect to a facility or part thereof that is altered by, on behalf [**12] of, or for the use of an establishment in a manner that affects or could affect the usability of the facility or part thereof, *a failure to make alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to*

*and usable by individuals with disabilities*, including individuals who use wheelchairs."

<u>Roberts v. Royal Atl. Corp.</u>, 542 F3d 363, 368 [2d Cir 2008])

130.     "Where the entity is undertaking an alteration that affects or could affect usability of or *access to an area of the facility containing a primary function*, the entity shall also make the alterations in such a manner that, to *the maximum extent feasible, the path of travel* to the altered area and the bathrooms, telephones, and drinking fountains serving the altered area, are readily accessible to and usable by individuals with disabilities where such alterations to the path of travel or the bathrooms, telephones, and drinking fountains serving the altered area are *not disproportionate to the overall alterations* in terms of cost and scope (as determined under criteria established by the Attorney General). 42 U.S.C. § 12183(a)(2) (emphasis added)." <u>Id.</u>

131.     "We must therefore first determine whether a challenged facility (or part thereof) has been "altered" in "a manner that affects or could affect its usability." <u>Id.</u>

132.     ""If alterations have been made, a defendant "discriminates" if those altered areas – and paths of travel to altered areas that "contain a primary function" – are not made readily accessible to disabled individuals "to the maximum extent feasible."" <u>Id.</u>

133.     "Even in the absence of alterations, a defendant nonetheless "discriminates" if it fails to remove any existing barriers to accessibility where such removal "is readily achievable."" Id. § 12182(b)(2)(A)(iv). <u>Roberts v. Royal Atl. Corp.</u>, 542 F3d 363, 369 [2d Cir 2008]

19

134.    Defendant MAX DEALS BOSTON INC. and/or Defendant WHITE POST ASSOCIATES, LLC made alterations to a primary function area of the Subject Facility after January 26, 1992. One, or both of them, failed to make the Subject Facility and/or paths of travel to a primary function area of the Subject Facility readily accessible to the maximum extent feasible for individuals with disabilities and thereby failed to make it comply with the 1991 ADA Standards.

135.    Defendant MAX DEALS BOSTON INC. and/or Defendant WHITE POST ASSOCIATES, LLC made alterations to a primary function area of the Subject Facility after March 15, 2012, and one or both of them failed to make the Subject Facility and/or paths of travel to that primary function area readily accessible to the maximum extent feasible for individuals with disabilities and failed to make it comply with the 2010 ADA Standards.

136.    At all relevant times herein, and after January 26, 1992, each or both Defendants failed to remediate architectural barriers to disabled individuals that exist in the Parking Lot and that were violations of the ADA, even though these remediations were readily achievable.

137.    At all relevant times herein, each or both Defendants failed to make the Parking Lot readily accessible to the maximum extent feasible for individuals with disabilities.

138.    At all relevant times herein, after March 15, 2012, each or both Defendants failed to make the Parking Lot readily accessible to the maximum extent feasible for disabled individuals.

## FACTUAL ALLEGATIONS AND FIRST CAUSE OF ACTION

### Plaintiff's Background

139.    Plaintiff has been diagnosed by a physician as having suffered ischemia. He has suffered right-sided hemiparesis, which caused nerve damage, made it difficult for him to stand, balance his body weight, and walk.

140.    Plaintiff's physician prescribed him a motorized mobility scooter.

141.    Plaintiff has obtained the motorized mobility scooter and uses it every day for all activities requiring mobility.

142.    Routes connecting accessible spaces and all features, goods and services of a facility must be level, properly sloped, sufficiently wide and without cracks, holes or other hazards that can pose danger of tipping, catching wheels, or falling.

143.    Plaintiff is "disabled" under the statute, which in pertinent part states:

> *Disability* means, with respect to an individual, a physical or mental impairment that substantially limits one or more of the major life activities of such individual…. The phrase *major life activities* means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.

> 28 C.F.R. §36.104 (italics in original).

144.    One accessible parking space in the Parking Lot is immediately in front of the entrance to Max Deals.

145.    That accessible parking space in the Parking Lot is the closest to Max Deals.

146.     One access aisle in the Parking Lot is immediately in front of the entrance to Max Deals.

147.     That access aisle in the Parking Lot is the closest to Max Deals.

148.     The aforementioned accessible parking space in the Parking Lot is located immediately to the left of the access aisle.

149.     The aforementioned access aisle in the Parking Lot is located immediately to the right of the accessible parking space.

150.     Plaintiff has difficulties walking and must use his motorized mobility scooter to enter and exit an accessible van.

151.     Plaintiff lives on Manhattan's Upper West Side.

152.     Plaintiff lived on Manhattan's Upper West Side for approximately seven years.

153.     Plaintiff visits friends in the Bronx when he plays tennis in the Bronx parks.

154.     Plaintiff regularly shops in the Bronx.

155.     Plaintiff visits parks and other attractions in the Bronx.

156.     Max Deals is in Allerton and/or Pelham Parkway, the Bronx.

157.     Plaintiff lives approximately 11 miles away from Max Deals.

158.     Plaintiff lives less than 30 minutes away from Max Deals by an accessible van.

159.     Plaintiff uses his mobility scooter and travels, shops in stores and goes to restaurants in Manhattan and in other boroughs of New York City.

160.     Plaintiff uses his mobility scooter, travels, shops in stores and goes to restaurants in neighborhoods in the Bronx, including Allerton, West Bronx, Castle Hill, Riverdale, the Valley, Parkchester, East Bronx, Co-op City, Longwood, Pelham Bay, Pelham Parkway, and Williamsbridge among others.

161.    Plaintiff uses his mobility scooter, travels, shops in stores and goes to restaurants in neighborhoods throughout the five New York City boroughs.

162.    Plaintiff often visits these neighborhoods in an accessible van.

163.    Plaintiff often visits these neighborhoods by subway.

164.    Plaintiff takes trips to and visits the Bronx, where he meets with friends as part of a social program sponsored by Montefiore Hospital's Adaptive Sports Program.

165.    Plaintiff visits the Bronx approximately once per month.

166.    Plaintiff has been visiting the Bronx for over ten years.

167.    During his visits to the Bronx Plaintiff meets with friends who live in the Bronx.

168.    Plaintiff shops in the Bronx.

169.    Plaintiff dines in various neighborhoods throughout the Bronx.

170.    Plaintiff often visits the Bronx parks, including the New York Botanical Gardens, the Bronx Zoo, and Van Cortlandt Park.

171.    Plaintiff shopped in Max Deals in 2024.

172.    Plaintiff shopped in Max Deals in 2025.

173.    Plaintiff intends to continue shopping in Max Deals in 2025.

174.    Plaintiff intends to continue shopping in Max Deals in 2026.

175.    Plaintiff intends to continue shopping in Max Deals in the future.

176.    In August 2025, Plaintiff arranged for a trip in an accessible van and travelled in it to Max Deals.

177.    In August 2025, the driver of an accessible van dropped off Plaintiff in an accessible space in the Parking Lot adjacent to Max Deals.

178.     At all relevant times herein, and in August 2025, Plaintiff had difficulties controlling and maneuvering his motorized mobility scooter in a safe manner on a steep slope of the accessible space in the Parking Lot.

179.     At all relevant times herein, and in August 2025, Plaintiff had difficulties controlling and maneuvering his motorized mobility scooter in a safe manner on a steep slope of the access aisle of the Parking Lot.

180.     At all relevant times herein, and in August 2025, Plaintiff had difficulties controlling and maneuvering his motorized mobility scooter to shop in aisles inside the store Max Deals, because upon information and belief, the store's aisles are impermissibly narrow and in violation of the 1991 and/or 2010 ADA Standards.

181.     At all relevant times herein, and in August 2025, due to the architectural barriers Plaintiff encountered in the Parking Lot and/or inside the aisles of Max Deals, he left frustrated and disappointed.

182.     The Parking Lot was designed by Defendants, who did not have in mind the needs of disabled individuals, including Plaintiff, and thereby they failed to accommodate and facilitate access to Max Deals for disabled individuals.

183.     The Parking Lot was designed by Defendants, who did not have in mind the needs of disabled individuals and thereby they failed to accommodate Plaintiff and facilitate his access to the Parking Lot.

184.     The Parking Lot was designed by Defendants, who did not have in mind Plaintiff nor the needs of disabled individuals, and thereby they failed to accommodate him and facilitate his access to the Subject Facility.

185.    At all relevant times herein, and in August 2025, Defendants discriminated against Plaintiff by denying him a safe, accessible, and navigable path of travel to Max Deals from the Parking Lot.

186.    The Parking Lot was designed by Defendants, who disregarded the accessibility requirements of the ADA and failed to both accommodate Plaintiff and facilitate his access to Max Deals.

**Plaintiff Intends to Return to Max Deals**

187.    Max Deals is in Pelham Parkway, Bronx, NY.

188.    Max Deals is within 11 miles from Plaintiff's home on the Upper West Side in Manhattan.

189.    Plaintiff visits the Bronx approximately once per month.

190.    Plaintiff has been visiting the Bronx for over ten years.

191.    During his visits to the Bronx Plaintiff meets with friends who live in the Bronx.

192.    Plaintiff shops in the Bronx.

193.    Plaintiff dines in various neighborhoods throughout the Bronx.

194.    Plaintiff often visits the Bronx parks, including the New York Botanical Gardens, the Bronx Zoo, and Van Cortlandt Park.

195.    Plaintiff plays tennis with friends in the Bronx approximately once per month.

196.    Plaintiff intends to visit Max Deals again in the future when he visits Pelham Parkway and purchase goods offered for sale in it, as soon as the architectural barriers are removed.

**Plaintiff is a Tester**

197.    Plaintiff is an advocate of the rights of disabled persons and is a tester for the purpose of asserting his civil rights.

198.    Plaintiff visits places of public accommodation to determine whether they are compliant with the ADA.

199.    Completely independent of the personal desire to have access to Max Deals free of illegal barriers to access, Plaintiff is a tester for the purpose of discovering, encountering, and engaging discrimination against the disabled in public accommodations.

200.    As a tester, Plaintiff visits public accommodations and purposely encounters barriers to access.

201.    Plaintiff purposely tests barriers to access in public accommodations to determine whether they are unlawful.

202.    When Plaintiff determines that barriers to access are unlawful, he initiates legal action against an owner, operator, lessor, or lessee of a public accommodation to end discrimination.

203.    Following completion of legal action, Plaintiff intends to return to the same place of public accommodation to ensure its compliance with the ADA.

204.    As a tester, Plaintiff visited Max Deals to encounter architectural barriers to access.

205.    As a tester, Plaintiff personally encountered the architectural barriers in the Parking Lot.

206.    Plaintiff visited Max Deals, purchased an item in it, and encountered ADA violations in its Parking Lot.

207.    Plaintiff visited Max Deals, purchased an item in it, and encountered ADA violations inside of the store.

208.    Plaintiff encountered the ADA violations during his visit to Max Deals.

209.    Plaintiff encountered the ADA violations in the Parking Lot.

210.    Plaintiff encountered the ADA violations inside the store.

211.    Following conclusion of this lawsuit, Plaintiff intends to return to Max Deals as both a customer, who wants to shop in Max Deals, and as a tester to determine whether Defendants remediated the ADA violations.

212.    Plaintiff's motivation to return to Max Deals in part stems from his desire to utilize ADA litigation to make his community more accessible for Plaintiff and other disabled individuals, who cannot visit Max Deals because of the architectural barriers in its Parking Lot and inside the store.

213.    Plaintiff pledges to do whatever is necessary to create the requisite standing to confer jurisdiction upon this Court, including returning to Max Deals as soon as it is accessible, so that an injunction can be issued by this Court upon Defendants, ordering them to remediate the ADA violations in the Parking Lot and inside the store.

214.    Following conclusion of this lawsuit, Plaintiff intends to visit Max Deals at least twice a year to ensure that Defendants comply with the ADA and to shop in it.

215.    Plaintiff is confident that Defendants will not remediate the ADA violations in Max Deals without the Court's intervention.

216.    Plaintiff is confident that Defendants will not remediate the ADA violations in the Parking Lot without the Court's intervention.

217.        Plaintiff is confident that Defendants will not remediate the ADA violations inside the store without the Court's intervention.

218.        Plaintiff will continue to suffer discrimination without the Court's intervention.

219.        Plaintiff will enforce the injunction once it is issued by the Court.

## Violations of Title III in the Subject Facility

220.        At all relevant times herein, and in August 2025, Plaintiff had difficulties gaining access to Max Deals when he visited it, because of the unlawful architectural barriers for disabled individuals, and therefore has suffered an injury in fact.

221.        At all relevant times herein, and after January 26, 1992, each or both Defendants failed to make Max Deals and/or the Subject Facility readily accessible to the maximum extent feasible for individuals with disabilities.

222.        At all relevant times herein, and after January 26, 1992, each or both Defendants failed to make Max Deals and/or the Subject Facility accessible for individuals with disabilities when it was readily achievable for each of them to do so.

223.        At all relevant times herein, and after January 26, 1992, each or both Defendants failed to make the Parking Lot and/or the Subject Facility readily accessible to the maximum extent feasible for individuals with disabilities.

224.        At all relevant times herein, and after January 26, 1992, each or both Defendants failed to make the Parking Lot and/or the Subject Facility accessible for individuals with disabilities when it was readily achievable for each of them to do so.

225.    After January 26, 1992, each or both Defendants have engaged in unlawful practices in violation of the ADA.

226.    After January 26, 1992, each or both Defendants have engaged in unlawful practices in violation of the New York State Civil laws.

227.    After January 26, 1992, each or both Defendants have engaged in unlawful practices in violation of the New York State Human Rights laws.

228.    After January 26, 1992, each or both Defendants have engaged in unlawful practices in violation of the New York City Human Rights laws.

229.    After March 15, 2012, each or both Defendants failed to make Max Deals and/or the Subject Facility readily accessible to the maximum extent feasible for individuals with disabilities.

230.    After March 15, 2012, each or both Defendants failed to make the Parking Lot and/or Subject Facility readily accessible to the maximum extent feasible for individuals with disabilities.

231.    After March 15, 2012, each or both Defendants have engaged in unlawful practices in violation of the ADA.

232.    After March 15, 2012, each or both Defendants have engaged in unlawful practices in violation of the New York State Civil laws.

233.    After March 15, 2012, each or both Defendants have engaged in unlawful practices in violation of the New York State Human Rights laws.

234.    After March 15, 2012, each or both Defendants have engaged in unlawful practices in violation of the New York City Human Rights laws.

235.    After March 15, 2012, each or both Defendants have engaged in unlawful practices in violation of the ADA, the New York State Civil laws, and the New York State and City Human Rights laws.

236.    Since August 2025, through the present time, each or both Defendants continue to engage in unlawful practices in violation of the ADA, the New York State Civil laws, and the New York State, and New York City Human Rights laws.

237.    At all relevant times herein, due to the architectural barriers for disabled individuals which remain in the Parking Lot, and inside the store, in violation of the ADA, Plaintiff has difficulties visiting Max Deals and is being discriminated against in violation of the ADA, the New York State Civil Rights laws, and the New York State, and New York City Human Rights laws.

238.    At all relevant times herein, the architectural barriers for disabled individuals to access Max Deals and/or the Subject Facility have made it difficult for Plaintiff to visit it and have caused him embarrassment and frustration.

239.    Because Max Deals and/or the Subject Facility is a place of public accommodation, Defendants are responsible for complying with the ADA, 28 C.F.R. §36.304.

240.    Because Max Deals' Parking Lot is public accommodation, Defendants are responsible for complying with ADA, 28 C.F.R. §36.304.

241.    Because the Subject Facility is public accommodation, Defendants are responsible for complying with ADA, 28 C.F.R. §36.304.

242.    At all relevant times herein, the architectural barriers for disabled individuals that exist inside the store, and/or the Parking Lot, and/or that have frustrated Plaintiff's access to Max Deals, have greatly inconvenienced Plaintiff.

243.     Max Deals violates 42 U.S.C. §12181, §12182, §12183, §12204 of the ADA, 28 C.F.R. §36.302, and §36.304.

244.     In 1991, ADA Standards for Accessible Design Title III Regulation 28 CFR Part 36 was published ("1991 Standards").

245.     The Department of Justice ("DOJ") published revised regulations for Title III of the ADA in the Federal Register on September 15, 2010. "These regulations adopted revised, enforceable accessibility standards called the 2010 ADA Standards for Accessible Design, '2010 Standards'". (See, 2010 Standards, Overview) These standards "set minimum requirements – both scoping and technical – for newly designed and constructed, or altered … public accommodation, and commercial facilities to be readily accessible to and usable by individuals with disabilities." Id. The DOJ provided that document in one publication and it includes the 2010 Standards for public accommodation and commercial facilities, which consist of Title III regulations at 28 C.F.R. Part 36, subpart D, and 2004 ADAAG at 36 C.F.R. Part 1191, appendices B and D.

246.     At all relevant times herein, Defendants are discriminating against Plaintiff, because at their Subject Facility they are denying him access to, as well as full and equal enjoyment of, the goods, services, facilities, privileges, advantages, and/or accommodations by means of the architectural barriers to disabled individuals at the Subject Facility, the existence of which is in violation of the ADA, including, but not limited to those listed below.

247.     At all relevant times herein, the Parking Lot serves Max Deals.

248.     In this Complaint, and at all relevant times herein, all references to the accessible parking space ("Accessible Parking Space") and the access aisle ("Access Aisle") refer to

the accessible space and the adjoining access aisle, immediately in front of the entrance to the store Max Deals.

249.    "**Signage.** Accessible parking spaces shall be designated as reserved by a sign showing the symbol of accessibility (see 4.30.7). Spaces complying with 4.1.2(5)(b) shall have an additional sign "Van-Accessible" mounted below the symbol of accessibility. Such signs shall be located so they cannot be obscured by a vehicle parked in the space." 1991 Standards §4.6.4*

250.    "**Identification.** Parking *space* identification signs shall include the International Symbol of *Accessibility* complying with 703.7.2.1. Signs identifying van parking *spaces* shall contain the designation "van accessible." Signs shall be 60 inches (1525 mm) minimum above the finish floor or ground surface measured to the bottom of the sign." 2010 Standards §502.6.

251.    At all relevant times herein, and in August 2025, there is no identification sign identifying the Accessible Parking Space in violation of 1991 Standards §4.6.4*

252.    At all relevant times herein, and in August 2025, there is no identification sign identifying the Accessible Parking Space in violation of 2010 Standards §502.6.

253.    "**Accessible Elements and Spaces: Scope and Technical Requirements. Minimum Requirements.** One in every eight accessible spaces, but not less than one, shall be served by an access aisle 96 in (2440 mm) wide minimum and shall be designated "van accessible" as required by 4.6.4. The vertical clearance at such spaces shall comply with 4.6.5. All such spaces may be grouped on one level of a parking structure." 1991 Standards §4.1.2(b)

254.  "**Van Parking Spaces.** For every six or fraction of six parking spaces required by 208.2 to comply with 502, at least one shall be a van parking space complying with 502." 2010 Standards §208.2.4.

255.  "**Parking Spaces.** Accessible parking spaces shall be at least 96 in (2440 mm) wide. Parking access aisles shall be part of an accessible route to the building or facility entrance and shall comply with 4.3. Two accessible parking spaces may share a common access aisle. Parked vehicle overhangs shall not reduce the clear width of an accessible route. Parking spaces and access aisles shall be level with surface slopes not exceeding 1:50 (2%) in all directions." 1991 Standards §4.6.3*

256.  "**Vehicle Spaces.** Car parking spaces shall be 96 inches (2440 mm) wide minimum and van parking spaces shall be 132 inches (3350 mm) wide minimum, shall be marked to define the width, and shall have an adjacent access aisle complying with 502.3." 2010 Standards §502.2.

257.  The Accessible Parking Space is 96 inches wide.

258.  The Access Aisle is no greater than 96 inches wide.

259.  The widths of the Access Aisle is less than 96 inches required for accessible van parking space in violation of 1991 Standards §4.6.3*.

260.  The widths of the Access Aisles is less than 96 inches required for accessible van parking spaces in violation of 2010 Standards §502.2.

261.  Because the Accessible Space is 96 inches wide, less than 132 inches wide, and because the Access Aisle adjoining it is less than 96 inches wide, the Accessible Space is not compliant with §502.2 of 2010 Standards to satisfy the minimum requirements for an accessible van parking space.

262. The Accessible Space is not compliant with §4.6.3* of 1991 Standards to satisfy the minimum requirements for an accessible van parking space.

263. There is no van-accessible space immediately in front of Max Deals in the Parking Lot in violation of 1991 Standards §4.6.3*.

264. There is no van-accessible space immediately in front of Max Deals in the Parking Lot in violation of 2010 Standards §502.2.

265. "**Floor or Ground Surfaces.** Access aisles are required to be nearly level in all directions to provide a surface for wheelchair transfer to and from vehicles. The exception allows sufficient slope for drainage. Built-up curb ramps are not permitted to project into access aisles and parking spaces because they would create slopes greater than 1:48." 2010 Standards §Advisory 502.4.

266. "**Floor or Ground Surfaces.** Parking *spaces* and access aisles serving them shall comply with 302. Access aisles shall be at the same level as the parking *spaces* they serve. Changes in level are not permitted. **EXCEPTION:** Slopes not steeper than 1:48 shall be permitted." 2010 Standards §502.4.

267. Thus, maximum permissible slopes of accessible parking spaces and access aisles serving them must not be steeper than 2.08%. 2010 Standards §502.4.

268. At all relevant times herein, Defendants violated §4.6.3* of 1991 Standards.

269. At all relevant times herein, Defendants violated 2010 Standards §Advisory 502.4.

270. At all relevant times herein, Defendants violated §502.4 of 2010 Standards.

271. The Accessible Parking Space has a running slope of 4.3%, which is equivalent to 1:23.26, in violation of 1991 Standards §4.6.3*.

272.     The Accessible Parking Space has a running slope of 4.3%, which is equivalent to 1:23.26, in violation of 2010 Standards §502.4.

273.     The Accessible Parking Space has a cross slope of 3.7%, which is equivalent to 1:27.03, in violation of 1991 Standards §4.6.3*.

274.     The Accessible Parking Space has a cross slope of 3.7%, which is equivalent to 1:27.03, in violation of 2010 Standards §502.4.

275.     The Access Aisle has a running slope of 4.6%, which is equivalent to 1:21.74, in violation of 1991 Standards §4.6.3*.

276.     The Access Aisle has a running slope of 4.6%, which is equivalent to 1:21.74, in violation of 2010 Standards §502.4.

277.     The Access Aisle has a cross slope of 6.5%, which is equivalent to 1:15.38, in violation of 1991 Standards §4.6.3*.

278.     The Access Aisle has a cross slope of 6.5%, which is equivalent to 1:15.38, in violation of 2010 Standards §502.4.

279.     "**Width.** The minimum clear width of an accessible route shall be 36 in (915 mm) except at doors (see 4.13.5 and 4.13.6)." 1991 Standards §4.3.3.

280.     "**Clear Width.** Except as provided in 403.5.2 and 403.5.3, the clear width of walking surfaces shall be 36 inches (915 mm) minimum." 2010 Standards §403.5.1.

281.     "**Clear Width at Turn.** Where the accessible route makes a 180 degree turn around an element which is less than 48 inches (1220 mm) wide, clear width shall be 42 inches (1065 mm) minimum approaching the turn, 48 inches (1220 mm) minimum at the turn and 42 inches (1065 mm) minimum leaving the turn." 2010 Standards §403.5.2.

282.     Inside Max Deals store at least one of the aisles is 30.25 inches wide, in violation of 1991 Standards §4.3.3.

283.     Inside Max Deals store at least one of the aisles is 30.25 inches wide, in violation of 2010 Standards §403.5.1.

284.     Inside Max Deals store, where the accessible route – at least one of the aisles in the store – makes a 180 degree turn around an element which is less than 48 inches (1220 mm) wide, clear width is 30.25 inches, in violation of 2010 Standards §403.5.2.

285.     Plaintiff intends to visit Max Deals again within six months of the filing of this Complaint, or even sooner, as soon as the barriers to access, meticulously detailed in this Complaint, are removed. The purpose of that return visit would be to be a regular customer, who comes to enjoy goods and services offered at Max Deals, as well as to determine whether, and when, Max Deals has been made accessible, and to maintain standing for this lawsuit for Plaintiff's advocacy purposes, so that other disabled individuals would be able to enjoy Max Deals in the same way as able-bodied customers do, as well as to ensure that Defendants' discrimination of the disabled ends.

286.     Plaintiff intends to visit Max Deals again to enjoy the same access, the same experiences, the same goods, and the same services as are available to Defendants' able-bodied customers, as well as for advocacy purposes, but does not intend, nor has any desire whatsoever, to continue to repeatedly subject himself to Defendants' unequal treatment and blatant discrimination of him through their architectural barriers to equal access and engage in the futile gesture of attempting to patronize Max Deals, a business place of public accommodation, known to Plaintiff to have numerous and continuing pervasive

architectural barriers to equal access for wheelchair users, until Defendants remediate violations at Max Deals.

287.    Plaintiff has traveled to Max Deals as a customer, as well as an independent advocate for the disabled, encountered and/or observed the architectural barriers to access, which are detailed in this Complaint, engaged these barriers where physically possible, suffered legal harm, legal injury, and legal damages, and will continue to suffer such harm and injury as a result of the illegal barriers to equal access present at Max Deals until the Court issues an injunction ordering Defendants to remove their architectural barriers and change their policies and procedures to make Max Deals equally accessible to all.

288.    Plaintiff will continue to suffer discrimination and injury without the immediate relief provided by the ADA, as requested herein.

289.    To remedy this discriminatory situation, Plaintiff requires an inspection of Max Deals and/or the Subject Facility to measure and photograph architectural barriers that are in violation of the ADA to determine the areas of non-compliance with the law.

290.    The discriminatory violations described above are not an exhaustive list of Defendants' violations of the ADA and barriers to equal access to Max Deals, because Plaintiff was unable to access and assess all areas of Max Deals due to the architectural barriers encountered. A complete list of Max Deals ADA violations affecting Plaintiff as a wheelchair user, as well as putting in place a plan of remedial measures necessary to remove them, will require an on-site inspection by Plaintiff's representatives, pursuant to Federal Rule of Civil Procedure 34.

291.    At all relevant times herein, Defendants have failed to maintain the accessible elements at Max Deals. They neglected their continuing duty to review, inspect, and

discover transient accessible elements, which by nature of their design or placement, frequency of usage, exposure to weather and/or other factors, are prone to shift from compliant to noncompliant, so that these elements are discovered and remediated.

292.    Defendants have failed and continue to fail to alter their inadequate maintenance practices to prevent future recurrence of noncompliance with dynamic accessible elements at Max Deals in violation of 28 CFR §36.202 and §36.211.

293.    The architectural barriers for disabled individuals, described above, have a discriminative effect on Plaintiff, as a wheelchair user, making him unable to experience the same access to the goods, services, facilities, privileges, advantages, and accommodations of Max Deals as Defendants' able-bodied customers.

294.    At all relevant times herein, Defendants have failed to remove architectural barriers for disabled individuals that frustrate their accessibility to Max Deals in violation of 42 U.S.C. §12182(b)(2)(A)(iv).

295.    At all relevant times herein, and after January 26, 1992, Defendants have altered the Parking Lot.

296.    At all relevant times herein, and after March 15, 2012, Defendants have altered the Parking Lot.

297.    **New construction and alterations. (a) Design and construction.** "(1) Each facility or part of a facility constructed by, on behalf of, or for the use of a public entity shall be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities, if the construction was commenced after January 26, 1992." Section 35.151 of 28 CFR Part 35, §35.151 New construction and alterations.

298.    **"(2) Exception for structural impracticability.** (i) Full compliance with the requirements of this section is not required where a public entity can demonstrate that it is structurally impracticable to meet the requirements. Full compliance will be considered structurally impracticable only in those rare circumstances when the unique characteristics of terrain prevent the incorporation of accessibility features. (ii) If full compliance with this section would be structurally impracticable, compliance with this section is required to the extent that it is not structurally impracticable. In that case, any portion of the facility that can be made accessible shall be made accessible to the extent that it is not structurally impracticable." Section 35.151 of 28 CFR Part 35, §35.151 New construction and alterations.

299.    **"(b) Alterations.** (1) Each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the alteration was commenced after January 26, 1992." Section 35.151 of 28 CFR Part 35, §35.151 New construction and alterations.

300.    The Parking Lot was altered by one or more Defendants after January 26, 1992.

301.    The Parking Lot was altered by one or more Defendants after March 15, 2012.

302.    At all relevant times herein, each or both Defendants failed to make Max Deals readily accessible to disabled people, including those who use wheelchairs.

303.    The foregoing violations are violations of the 1991 ADAAG, and the 2010 ADAAG, as adopted by the U.S. Department of Justice. In instances where the 2010

ADAAG standards do not apply, the 1991 ADAAG standards apply, and the alleged violations set forth herein can be modified to comply with the 1991 ADAAG standards.

304. The removal of the physical barriers, dangerous conditions, and ADA violations alleged herein is and has been readily achievable and can be accomplished and carried out without significant difficulty or expense. 42 U.S.C. §12182(b)(2)(A)(iv); 42 U.S.C. §12181(9); 28 C.F.R. §36.304.

305. At all relevant times herein, it has been readily achievable for each of Defendants to remediate every one of the violations described above as the costs do not exceed the benefits.

306. Removal of the physical barriers and dangerous conditions present at Max Deals and/or the Parking Lot is readily achievable because of the site conditions, the structural design of the store and the straightforward nature of the necessary modifications.

307. To assist businesses in offsetting the costs associated with complying with the ADA and removing barriers to access for individuals with disabilities, §44 of the IRS Code provides a tax credit for small business owners, and §190 of the IRS Code provides a tax deduction for all business owners, including Defendants.

308. At all relevant times herein, removal of the architectural barriers and dangerous conditions at the Subject Facility has been readily achievable because of relative low cost of the necessary modifications.

309. At all relevant times herein, Defendants have had financial resources to make the modifications, including the financial assistance made available to Defendants by the government pursuant to §44 and/or §190 of the IRS Code.

310. At all relevant times herein, each of Defendants failed to construct and/or maintain the Parking Lot for it to be accessible for individuals with disabilities and the Parking Lot was in violation of 1991 ADA Standards. (Section 35.151 of 28 CFR Part 35, §35.151 New construction and alterations.)

311. At all relevant times herein, it has been structurally practicable for each of Defendants to meet the requirements of 1991 ADA Standards. (Section 35.151 of 28 CFR Part 35, §35.151 New construction and alterations.)

312. At all relevant times herein, the Parking Lot was not readily accessible for disabled individuals and is in violation of 2010 ADA Standards.

313. It was structurally practicable for each of Defendants to meet the requirements of the 2010 ADA Standards.

314. At all relevant times herein, the Parking Lot was not in compliance with the accessibility standards of Title III of 1991.

315. At all relevant times herein, the Parking Lot failed to comply with the accessibility standards of Title III of 1991.

316. At all relevant times herein, after the Parking Lot was altered, Defendants failed to bring it in compliance with the 1991 ADA Standards.

317. At all relevant times herein, each Defendant failed to maintain the Parking Lot in a manner compliant with the 1991 ADA Standards.

318. At all relevant times herein, the Parking Lot was designed in a manner that did not comply with 2010 ADA Standards.

319. At all relevant times herein, each of Defendants failed to construct the Parking Lot in compliance with the 2010 ADA Standards.

320.    At all relevant times herein, after the Parking Lot was altered by one or both Defendants, it did not comply with the 2010 ADA Standards.

321.    At all relevant times herein, each Defendant failed to maintain the Parking Lot in compliance with the 2010 ADA Standards.

322.    By continuing to maintain and/or operate the Parking Lot in a manner that does not comply with the ADA, each Defendant contributes to Plaintiff's sense of isolation and segregation and deprives him of the full and equal enjoyment of the goods, services, facilities, privileges, and accommodations available to able-bodied individuals.

323.    At all relevant times herein, each Defendant was required to remove the existing architectural barriers to the disabled in the Parking Lot when such removal was readily achievable.

324.    At all relevant times herein, as there have been alterations after January 26, 1992, to the Subject Facility, a place of public accommodation, each Defendant was required to ensure, to the maximum extent feasible, that the altered portions of the Parking Lot would be readily accessible to and usable by individuals with disabilities, including people who use wheelchairs. 28 CFR 36.402.

325.    The Parking Lot was constructed after January 26, 1993, as defined in 28 CFR 36.401, and Defendants' Subject Facility must be made readily accessible to and useable by individuals with disabilities as defined by the ADA.

326.    To date, each Defendant failed to comply with the above mandates.

327.    At all relevant times herein, each Defendant made alteration to the Parking Lot and failed to make portions of the Parking Lot "readily accessible to and usable by individuals with disabilities," even though alteration to the Parking Lot was commenced after January

26, 1992, and/or after March 15, 2012, in violation of 35.151 of 28 CFR Part 35, §35.151(b).

328. Each Defendant has violated its statutory obligation to ensure that its policies, practices, and procedures address compliance with the 2010 ADA Standards.

329. Each Defendant violated its obligation to remove architectural barriers that prevent disabled individuals, including Plaintiff, from enjoying goods and services provided by the public accommodation under their control, thus discriminating against him.

330. Plaintiff's requested relief serves public interest.

331. At all relevant times herein, the architectural barriers to entry for disabled individuals, the removal of which was, and is, readily achievable, and other violations of the ADA, still exist in the Parking Lot and have not been remediated, or altered, in such a way as to effectuate compliance with the provisions of the ADA.

332. Pursuant to the ADA, 42 U.S.C. §12101, §12182, and 28 C.F.R. §36.304, each Defendant was required to make Max Deals readily accessible to persons with disabilities.

333. Pursuant to the ADA, 42 U.S.C. §12101, §12182, and 28 C.F.R. §36.304, each Defendant was required to make the Parking Lot readily accessible to persons with disabilities.

334. Each Defendant should have removed the architectural barriers to entry for disabled individuals at the Subject Facility. They have failed to comply with that mandate.

335. Each Defendants' failure to remove the architectural barriers to entry for disabled individuals to a place of public accommodation constitutes a pattern and practice of intentional disability discrimination and is subject to enforcement under 42 U.S.C. §12188 and 28 C.F.R. §503.

336.     At all relevant times herein, it was not structurally impracticable for each Defendant to make the Parking Lot accessible for disabled individuals.

337.     At all relevant times herein, removal of all architectural barriers for disabled individuals existing at the Parking Lot was, and is, readily achievable by each Defendant.

338.     At all relevant times herein, accommodations to Plaintiff and removal of the architectural barriers for disabled individuals at the Parking Lot by each Defendant has been readily achievable, would not impose an undue hardship on them and would not fundamentally alter the nature of their program, activity, or nature of the business.

339.     Plaintiff has a realistic, credible, existing, and continuing threat of discrimination from Defendants' non-compliance with the ADA in connection with the Subject Facility.

340.     Defendants' failure to make the Parking Lot accessible for disabled individuals has denied Plaintiff an equal opportunity to participate in, or to benefit from, services, or accommodations, because of his disability.

341.     The effect of the practices complained of has been to deprive Plaintiff of the full and equal enjoyment of Max Deals and to otherwise adversely affect his status as a member of the public interested in accessing the place of public accommodation owned, leased, leased to, constructed, maintained, managed and/or operated by each Defendant.

342.     At all relevant times herein, the Parking Lot is not accessible to, or readily usable by, individuals with disabilities.

343.     Pursuant to 42 U.S.C. §12188, this Court was vested with the authority to grant Plaintiff injunctive relief, including an order to alter the Parking Lot, to make it accessible to, and useable by, Plaintiff to the extent required by the ADA, as well as close Max Deals until the required modifications are completed.

344.     At all relevant times herein, each Defendant engaged in flagrant disregard for the ADA, and the New York laws, which obligate them to make all readily achievable accommodations and modifications to remove architectural barriers to access and use of Max Deals is legally inexcusable.

345.     Allowing Defendants to deleteriously detrimentally prolong their practices would encourage them to continue to blatantly disregard the ADA, the New York State Civil laws, and the New York State and City Human Rights laws, and discriminate against Plaintiff.

346.     The inexcusability of actions by each Defendant is exacerbated by the fact that over 30 years have passed since the effective date of Title III of the ADA. During that time, they operated at a profit, should have accumulated sufficient funds to make alterations and had numerous opportunities to remove the architectural barriers and end discrimination, but did not do so.

347.     At all relevant times herein, by not removing the architectural barriers for disabled individuals, which barred Plaintiff's access, inconvenienced, embarrassed, and humiliated him, each Defendant gave a crystal-clear message to Plaintiff that his patronage is neither needed, desired, welcomed, or wanted.

**SECOND CAUSE OF ACTION**

**Violations of the New York State Human Rights Laws**

348.     Plaintiff re-alleges, and incorporates, by this reference, all the allegations set forth in this complaint, as if fully set forth herein.

349.    The New York State Human Rights Law, in relevant part, provides the following:

>   It shall be an unlawful discriminatory practice for any
>   person, being the owner, lessee, proprietor, manager,
>   superintendent, agent or employee of any place of public
>   accommodation … because of the … disability … of any
>   person, directly or indirectly, to refuse, withhold from or
>   deny to such person any of the accommodations, advantages,
>   facilities or privileges thereof … to the effect that any of the
>   accommodations, advantages, facilities and privileges of any
>   such place shall be refused, withheld from or denied to any
>   person on account of … disability … .

NYS Executive Law §296(2)(a)

350.    The Subject Facility is a place of public accommodation, as defined in New York State Human Rights Law §292(9).

351.    Each Defendant has violated the New York State Human Rights Law by being in violation of the rights provided under the ADA.

352.    Each Defendant is in violation of the New York State Human Rights Law by denying Plaintiff full and safe access to the benefits, accommodations, and services of the Subject Facility.

353.    Each Defendant does not provide Plaintiff with equal opportunity to use its public accommodation.

354.    Each Defendant has failed to make all readily achievable accommodations, and modifications to remove barriers to access in violation of Executive Law §296(2)(c)(iii).

46

355.    Each Defendant has not provided Plaintiff with evenhanded treatment in violation of New York State Human Rights Law §296.

356.    Each Defendants' unequal treatment of Plaintiff was demonstrated when he was discriminated against.

357.    Each Defendant has, because of Plaintiff's disability, directly, or indirectly, refused, withheld from, or denied him the accommodations, advantages, facilities, or privileges of its public accommodations.

358.    Each Defendant has demonstrated that Plaintiff's patronage is unwelcome, unwanted, undesirable, unacceptable, and objectionable.

359.    In violation of the New York State Human Rights Law, each Defendant has discriminated against Plaintiff.

360.    Plaintiff demands compensatory damages from Defendants in the amount of $1,000 under the New York State Human Rights Law, NY CLS Exec §297(9).


## **THIRD CAUSE OF ACTION**

### **Violations of the New York State Civil Rights Laws**

361.    Plaintiff re-alleges, and incorporates by this reference, all the allegations set forth in this complaint, as if fully set forth herein.

362.    Each Defendant has violated Plaintiff's civil rights because of his disability.

363.    Plaintiff is entitled to recover the penalty prescribed by New York State Civil Rights Law §40-c and §40-d, in the amount of $500 for each violation from Defendants.

364.    Notice of this action is being served upon the attorney general, as required by New York Civil Rights Law, §40-d, in accordance with the statute.

365.    A copy of this Complaint is being served upon the attorney general by the United

States mail, first class mail, postage prepaid.

## FOURTH CAUSE OF ACTION

### Violations of the New York City Human Rights Law

366.    Plaintiff re-alleges, and incorporates by this reference, all the allegations set forth

in this complaint, as if fully set forth herein.

367.    The New York City Human Rights Law, in relevant part, provides the below.

It shall be an unlawful discriminatory practice for any person

who is the owner, franchisor, franchisee, lessor, lessee,

proprietor, manager, superintendent, agent or employee of

any place or provider of public accommodation:

1. Because of any person's actual or perceived …

disability …, directly or indirectly:

(a) to refuse, withhold from or deny to such

person the full and equal enjoyment, on equal

terms and conditions, of any of the

accommodations, advantages, services,

facilities or privileges of the place or provider

of public accommodation;

NYC Admin. Code §8-107(4)

368.    Each Defendant has not reasonably accommodated Plaintiff in violation of New

York City's Administrative Code §8-102(4), (16), (17), (18), §8-107(4) and §8-107(15).

369.     In violation of the New York City Administrative Code, each Defendant has unlawfully discriminated against Plaintiff.

370.     Reasonable accommodations and modifications are necessary to enable Plaintiff to enjoy non-restricted access and use of Defendants' Subject Facility.

371.     In violation of the New York City Administrative Code the owners, operators, lessees, proprietors, managers, agents and/or employees of the Subject Facility have, because of the actual, or perceived, disability of Plaintiff directly, or indirectly, refused, withheld from, and denied him the accommodations, advantages, facilities, or privileges thereof.

372.     In violation of the New York City Administrative Code, on the basis of Plaintiff's disability, each Defendant has demonstrated that Plaintiff's patronage is unwelcome, objectionable and not acceptable.

373.     Each Defendant is in violation of the New York City Human Rights Law by denying Plaintiff full and safe access to the benefits, accommodations, and services of the Subject Facility.

374.     Pursuant to New York City Human Rights Law §8-502(c), notice of this action is being served upon the New York City Commission on Human Rights in accordance with the statute.

375.     A copy of this Complaint is being served upon the New York City Commission on Human Rights by United States mail, first class mail, postage prepaid.

376.     Plaintiff demands compensatory damages in the amount of $1,000 from Defendants under the New York City Human Rights Law, NYC Admin. Code §8-125.

## **ATTORNEY'S FEES AND COSTS**

377.    Plaintiff had to retain the undersigned counsel for the filing and prosecution of this action. Plaintiff is entitled to have his reasonable attorney's fees, including litigation expenses, and costs, including expert fees, paid by Defendants, pursuant to the ADA, 28 C.F.R. §36.505 and New York Executive Law §297(10). Furthermore, pursuant to the New York City Human Rights Law, the Court may award the prevailing party reasonable attorney's fees. Under that law's definition "prevailing" includes a plaintiff, whose commencement of litigation has acted as a catalyst to effect policy change on the part of the defendant. NYCHRL, in pertinent part, states the below.

> In any civil action commenced pursuant to this section, the Court, in its discretion, may award the prevailing party reasonable attorney's fees, expert fees and other costs. For the purposes of this subdivision, the term "prevailing" includes a Plaintiff whose commencement of litigation has acted as a catalyst to effect policy change on the part of the defendant, regardless of whether that change has been implemented voluntarily, as a result of a settlement or as a result of a judgment in such Plaintiff's favor. The Court shall apply the hourly rate charged by attorneys of similar skill and experience litigating similar cases in New York County when it chooses to factor the hourly rate into the attorney's fee award.
>
> NYC Admin. Code §8-502(g)

## COMPENSATORY AND STATUTORY MONETARY DAMAGES

378.    Plaintiff demands compensatory damages in the amount of $1,000 from Defendants under the New York State Human Rights Law, NY CLS Exec §297(9) and the New York City Human Rights Law, NYC Admin. Code §8-125.

> In calculating compensatory damages under the NYSHRL and the NYCHRL, a Court in the Southern District of New York just a few months ago found relevant the fact that '[t]he New York City Human Rights Commission has deemed awards of $1,000 to be sufficient in cases where complainants did not establish any particular damage 'other than what a decent and reasonable individual would suffer when faced with such ignorant behavior.'
>
> Shalto v. Bay of Bengal Kabob Corp., 2013 WL 867429, (quoting and adapting Kreisler, 2012 WL 3961304, at *14)

379.    Plaintiff requests statutory monetary damages in the sum of $500 from Defendants to compensate him for their violation of New York Civil Rights Law §40-c and §40-d.

> New York Civil Rights Law §40-c holds that *any person* [emphasis added] who shall violate any of the provisions of New York Civil Rights Law §40-d 'shall for each and every violation thereof be liable to a penalty of not less than one hundred dollars nor more than five hundred dollars, to be

recovered by the person aggrieved thereby in any Court of competent jurisdiction in the county in which the defendant shall reside. … [T]his Court has the authority to order Defendant to pay Plaintiff the $500 in statutory damages contemplated by the New York Civil Rights Law for the disability discrimination Plaintiff has suffered….

<u>Shalto v. Bay of Bengal Kabob Corp.</u>, 2013 WL 867429

380.     The reason Plaintiff requests $500 from Defendants, and not a lower amount envisioned by the statutes, is due to the high number and extent of the violations, which were alleged in detail in this Complaint. Furthermore, the number of violations may be even greater, and they may be even more extensive, than those alleged here, and it is likely that they will be revealed upon inspection of the Subject Facility by an expert.

## **INJUNCTIVE RELIEF**

381.     Pursuant to 42 U.S.C. §12188 this Court is vested with the authority to grant Plaintiff injunctive relief, including an order to alter the Subject Facility to make it readily accessible to, and useable by, individuals with disabilities to the extent required by the ADA, the New York State Civil Rights Law, the New York State Human Rights Law, the New York City Human Rights Law, and close the Subject Facility until requisite modifications are completed.

382.     Plaintiff requests the Court to issue a permanent injunction enjoining Defendants from disability discrimination.

383.    Plaintiff requests the Court to issue a permanent injunction and order Defendants to alter their Subject Facility to make it readily accessible to and usable by individuals with disabilities. To achieve that, Plaintiff requests the Court to adopt relief ordered in <u>Shariff v. Alsaydi</u>, 2013 WL 4432218. Plaintiff requests the Court to order Defendants to prepare architectural plans remedying the violations of the 2010 Standards and to provide Plaintiff's counsel with those plans for review within 60 days of the Court's order. Plaintiff also requests that the injunction provides him with 30 days to file a motion seeking relief should Defendants' proposed architectural plans be inadequate to remedy the 2010 Standards violations specified in this Complaint. Plaintiff further requests that the injunction requires Defendants to implement architectural plans and remedy the violations within 60 days of either Plaintiff's agreement, or a ruling by the Court stating that the plans are adequate.

384.    Plaintiff requests the Court to issue a permanent injunction requiring Defendants to make all necessary modifications to Defendants' policies, practices, and procedures, so that Plaintiff would not be subject to further unlawful discrimination.

## **DECLARATORY RELIEF**

385.    Plaintiff is entitled to declaratory relief for the violations committed by Defendants, specifying the rights of Plaintiff as to the removal of the architectural barriers from the Subject Facility by Defendants.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff hereby respectfully demands judgment against Defendants, jointly and severally, and requests that this Court:

A.    Grant a permanent injunction

> i.)  Enjoining Defendants, their officers, management personnel, employees, agents, successors and assigns from engaging in discrimination based on disability;
>
> ii.) Requiring Defendants to alter their Subject Facility to make it readily accessible to, and usable for, Plaintiff and other individuals with disabilities;
>
> iii.) Compelling Defendants to make all necessary modifications to their policies, practices and procedures, so that Plaintiff would not be subject to further discrimination;
>
> iv.)Ordering Defendants to provide auxiliary aids, or services, or to modify their policies, or procedures, or provide an alternative method, so that Plaintiff, and other disabled individuals, would be able to obtain full and equal enjoyment of the Subject Facility owned, operated, maintained, or leased, by Defendants, in accordance with Title III of the ADA, the New York State Civil Rights Laws, and the New York State and City Human Rights Laws; and
>
> v.)  Ordering Defendants to make the Subject Facility readily accessible to and usable by Plaintiff and other individuals with disabilities.
>
> vi.)Ordering the issuance of an injunction that requires Defendants
>
> > i.   to prepare architectural plans remedying the ADA violations described in the Complaint, and

54

ii.  to provide Plaintiff's counsel with those plans for review within 60 days of the Court's Order.

vii.)  Ordering that the injunction affords Plaintiff 30 days to file a motion seeking relief on the basis that Defendants' proposed architectural plans are inadequate to remedy the ADA violations specified in the Complaint; and

viii.)  Ordering that the injunction requires Defendants to implement the architectural plans and remedy the violations within 60 days of either Plaintiff's agreement or a ruling by the Court that the plans are adequate.

B.  Enter declaratory judgment specifying Defendants' violations of the ADA, the New York State Civil laws, the New York State and City Human Rights laws, and declare the rights of Plaintiff as to Defendants' policies, procedures, facilities, goods and services offered to the public;

C.  Enter declaratory judgment specifying that the Subject Facility owned, operated, leased, controlled, maintained and/or administered by Defendants violates the ADA, the New York State Civil Rights Law, and the New York State and City Human Rights laws;

D.  Enter an order requiring Defendants to alter their Subject Facility and amenities to make them accessible to, and usable by, Plaintiff and other individuals with disabilities to the full extent required by Title III of the ADA, the New York State Civil Rights Law, and the New York State and City Human Rights laws;

E.  Hold Defendants liable for $500 in statutory monetary damages for their violations and award that sum to Plaintiff pursuant to the New York State Civil Rights Laws §40-c and §40-d;

F.    Hold Defendants liable for compensatory damages in the amount of $1,000 under the New York State and City Human Rights laws.

G.    Retain its jurisdiction over Defendants until their unlawful practices, acts, and omissions no longer exist;

H.    Find that Plaintiff is a prevailing party in this litigation.

I.    Award attorney's fees, expert fees, costs, expenses, and interest together with such other and further relief at law, or in equity, to which Plaintiff may be entitled; and

J.    Award such other and further relief as it deems necessary, just, and proper.

## JURY DEMANDED

Plaintiff demands a trial by jury of all the issues of fact and damages.

September 3, 2025

Respectfully submitted,

s:/Daniel Berke
Daniel Berke (db1855)

Daniel Berke (db1855)
Berke & Associates PLLC
203 East 72nd Street, Suite 6A
New York, NY 10021
Tel: (917) 747-4263
Email: danberke100@gmail.com
*Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 3, 2025, I filed the foregoing Complaint with the Court via CM/ECF, which caused notice to be served upon all e-filing attorneys of record. In addition, I also mailed copies of the foregoing Complaint by the United States mail, first class mail, postage prepaid, to the Civil Rights Bureau and the New York City Commission on Human Rights at the following addresses: Civil Rights Bureau, 28 Liberty Street, New York, NY 10005; and Damion K. L. Stodola, General Counsel, NYC Commission on Human Rights, 22 Reade Street, 2nd Floor, New York, NY 10007.

September 3, 2025

Respectfully submitted,

<u>s:/Daniel Berke</u>
Daniel Berke (db1855)

Daniel Berke (db1855)
Berke & Associates PLLC
203 East 72nd Street, Suite 6A
New York, NY 10021
Tel: (917) 747-4263
Email: danberke100@gmail.com
*Attorney for Plaintiff*